IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ROBERT CHACON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-16-0161 |
| | § | |
| DIRECTOR UTMB CMC, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

# **MEMORANDUM OPINION AND ORDER**

Plaintiff Robert Chacon, a state inmate proceeding *pro se* and *in forma pauperis*, filed this complaint under 42 U.S.C. § 1983 against the Director of UTMB Correctional Managed Care ("UTMB CMC") and John Doe, M.D., an unnamed UTMB physician. He claims that he suffered a debilitating stroke during a cardiac stress test because Doe refused to timely terminate the test and the Director failed to train Doe properly.

At the Court's request, the Office of the Attorney General of Texas, as *amicus curiae*, provided medical records and other documents relevant to plaintiff's claims in a *Martinez* report (Dkt. 24),[1] which the Court construed as a motion for summary judgment on behalf of the defendants (Dkt. 25). Plaintiff filed an untimely response to the motion for summary judgment without leave of court (Dkt. 31). Although the response is not properly before the

---

[1] *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1987). The report encompass over 700 pages of medical records, relevant administrative grievances, two physician affidavits, and legal briefing. The report was filed under seal to protect plaintiff's confidential medical information.

Court, the Court has reviewed the response in the interest of justice, and finds that it would not have precluded the granting of summary judgment had it been timely filed.

Having reviewed the motion, the response, the probative summary judgment evidence, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons shown below.

## I. BACKGROUND AND CLAIMS

Plaintiff alleges that, on March 23, 2015, he was transported to Hospital Galveston to undergo a cardiac stress test. He claims that he began showing signs of abnormal distress during the test, but that the physician administering the test refused to stop even after plaintiff started screaming and kicking. Plaintiff sustained a stroke, which left him partially paralyzed and permanently disabled.

Plaintiff sues the Director of UTMB CMC as the authority responsible for policy and training of all personnel, and John Doe, M.D., as the unnamed doctor who performed the stress test. He seeks monetary compensation and unspecified injunctive relief. The Court liberally construes plaintiff's pleadings as raising a claim against Doe for deliberate indifference to his health, safety, and serious medical needs in violation of the Eighth Amendment, and against the Director of UTMB CMC for failure to train.

In responding to the motion for summary judgment, plaintiff does not pursue claims for deliberate indifference or failure to train. Rather, he argues that the defendants were negligent and guilty of medical malpractice (Dkt. 31).

## II. STANDARDS OF REVIEW

### A. *Pro Se* Prisoner Litigants

Because the plaintiff is an inmate proceeding *in forma pauperis*, the Court is required by federal law to scrutinize the claims and dismiss the complaint, in whole or in part, if it determines that the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted," or "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §§ 1915A(b), 1915(e)(2)(B); *see also* 42 U.S.C. § 1997e(c) (providing that the court "shall on its own motion or on the motion of a party dismiss an action" if it is satisfied that the complaint is "frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief"). A *Martinez* report submitted by state officials, as was done in this case, is a tool to assist courts in making a determination of frivolity under 28 U.S.C. § 1915. *See Norton v. Dimazana*, 122 F.3d 286, 292–93 (5th Cir. 1997); *see also Cay v. Estelle*, 789 F.2d 318, 323 & n.4 (5th Cir. 1986) (discussing the utility of a *Martinez* report).

In reviewing the pleadings, the Court is mindful of the fact that the plaintiff in this case proceeds *pro se*. Complaints filed by *pro se* litigants are entitled to a liberal construction and, "however inartfully pleaded," must be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Even under this lenient standard a *pro se* plaintiff must allege more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

### B. Summary Judgment – Rule 56

The Court construed the *Martinez* report as a motion for summary judgment (Dkt. 25). Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, a court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Nor do unsubstantiated assertions, improbable inferences, or unsupported speculation stand as competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record

and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

Although the plaintiff in this case is proceeding *pro se*, the notice afforded by the Federal Rules of Civil Procedure and the local rules is considered sufficient to advise a *pro se* party of his burden in opposing a summary judgment motion. *Martin v. Harrison County Jail*, 975 F.2d 192, 193 (5th Cir. 1992). Even a *pro se* plaintiff must specifically refer to evidence in the summary judgment record in order to place that evidence properly before the court. *See Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 (5th Cir. 2016); *see also E.E.O.C. v. Simbaki, Ltd.*, 767 F.3d 475, 484 (5th Cir. 2014) (noting that *pro se* litigants must fundamentally abide by federal court rules and properly present summary judgment evidence).

### III. DISCUSSION

#### A. Eleventh Amendment Immunity

The defendants in this case are sued for monetary damages as to actions taken during employment with UTMB, a state agency. The Eleventh Amendment bars a section 1983 suit for money damages against UTMB as a state agency, or against state employees acting in their official capacity. *See Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002); *Aguilar v. Texas Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). Thus, to the extent plaintiff

seeks monetary damages against the defendants in their official capacities, his claims are barred by the Eleventh Amendment and are **DISMISSED WITH PREJUDICE**.

## B. John Doe, M.D.

Plaintiff claims in his complaint that defendant Doe ignored signs and symptoms that plaintiff was having a stroke during the test, and was deliberately indifferent to his health, safety, and medical needs by not immediately stopping the test and procuring proper treatment (Dkt. 1 at p. 4). In his response to the motion for summary judgment, however, plaintiff argues that the defendants were negligent and guilty of medical malpractice (Dkt. 31).[2]

As an inmate, plaintiff had a clearly established Eighth Amendment right not to be denied, by deliberate indifference, attention to his serious medical needs. *See Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). Prison officials violate the Eighth Amendment prohibition against cruel and unusual punishment when they evince deliberate indifference to a prisoner's serious medical needs, resulting in unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Deliberate indifference to a prisoner's serious medical needs raises a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976); *Jackson v. Cain*, 864 F.2d 1235, 1244 (5th Cir. 1989).

---

[2] Plaintiff's untimely response was not submitted under penalty of perjury, and his factual allegations therein do not constitute probative summary judgment evidence. *See, e.g., Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017) (holding that declarations and verified pleadings of a pro se prisoner that are dated and made on penalty of perjury constitute adequate summary judgment evidence); *see also Cantwell v. Sterling*, 788 F.3d 507, 509, n.1 (5th Cir. 2015) ("The ordinary rules of civil procedure are applicable in prisoner suits. Cantwell offered his testimony under penalty of perjury and declared it to be true and correct, so it must be credited on summary judgment.").

Negligence or medical malpractice, however, is not an issue of federal constitutional dimension. In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence. The Court held that a prison official cannot be found liable under the Eighth Amendment unless the official knows of and disregards an excessive risk to inmate health or safety; that is, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference. *Id.* at 837. The Eighth Amendment deliberate indifference standard is an "extremely high" one to meet. *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent" do not amount to deliberate indifference. *Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).

It is indisputable that an incorrect diagnosis by a physician will not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Nor is the failure to alleviate a significant risk that medical personnel should have perceived, but did not, sufficient to demonstrate deliberate indifference. *Farmer*, 511 U.S. at 838. Rather, a showing of deliberate indifference requires a prisoner to submit evidence establishing that medical personnel "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks omitted).

In support of their motion for summary judgment, the defendants submitted an affidavit of UTMB employee Masood Ahmad, M.D., who testifies as follows:

> My name is Masood Ahmad, M.D. I am over the age of 18 years, fully competent to make and execute this affidavit and have personal knowledge of the facts herein stated.
>
> I earned my Doctor of Medicine degree in 1967 and have been licensed as such in the State of Texas since 1973. I also hold specialty certifications with the American Board of Internal Medicine in Internal Medicine and in Cardiovascular Disease. I am presently employed as Professor in the Department of Internal Medicine–Cardiology for The University of Texas Medical Branch at Galveston (UTMB). I have been employed with UTMB since 1981. Part of my duties include providing medical care to TDCJ inmates who are referred to UTMB's Hospital Galveston Cardiology Specialty Clinic. As such, I am familiar with the standard of care for a cardiologist performing a dobutamine stress echocardiogram on a patient such as Robert Chacon in March 2015.
>
> I am making this affidavit in connection with Civil Action No. 3:16-CV-161, *Robert Chacon v. Director, UTMB-CMC, et al.*, in the United States District Court for the Southern District of Texas, Galveston Division. To prepare this affidavit, I have reviewed the available cardiology medical records of Robert Chacon, TDCJ #1550395, ("Plaintiff" or "Mr. Chacon") from January 9, 2015 to March 24, 2015. Plaintiff contends that his dobutamine stress echocardiogram, performed on March 24, 2015, was substandard, causing him to suffer a stroke.
>
> Based on my review of the medical records, Mr. Chacon, a 50-year old male, with a past medical history of depression and hypertension, presented on January 9, 2015 with epigastric chest pain. His physical exam showed normal heart sounds, and no murmurs, rubs or gallops. An EKG performed on this day showed sinus bradycardia (slow heart rate, but normal heart rhythm). Mr. Chacon was diagnosed with atypical chest pain and a dobutamine stress echocardiogram was recommended and scheduled for March 23, 2015.
> An echocardiogram is a test used to assess the heart's function and structures. A stress echocardiogram is a test done to assess how well the heart works under stress when it reaches a "target heart rate." The target heart rate can be attained by either exercise on a treadmill or a medication called dobutamine.

Dobutamine is used in instances where either the patient is unable to perform adequate exercise or where the act of exercising is unlikely to achieve the target heart rate necessary to identify the presence of heart ischemia. In the case of a dobutamine stress echocardiogram, the dobutamine is injected in a vein, which causes the heart to beat faster and mimic the effects of exercise. To obtain an accurate assessment of ischemic heart disease, Atropine Sulfate may also be used to achieve the target heart rate. Testing will continue unless any of the following endpoints are achieved:

- Target heart rate is achieved;
- Peak dobutamine infusion of 40mcg/kg/min is reached for 3 minutes;
- Development of EKG changes, such as ST segment changes, sustained supraventricular tachyarrthymias, premature ventricular complexes, atrioventricular block, ventricular tachycardia or fibrillation;
- Development of sonographic changes, such as new regional wall motion abnormalities, or a significant increase in gradient with valvular abnormalities;
- Hypertension (SBP > 220mmHg or DBP > 110mmHg) or hypotension (SBP < 90mmHg or DBP < 40mmHg);
- Intolerable symptoms, such as chest pain associated with EKG or echo cardio sonographic changes, or respiratory distress; or
- Patient refusal to proceed with further testing.

A dobutamine stress echocardiogram was appropriate for Mr. Chacon because it was necessary to detect and assess for coronary artery disease (CAD). Mr. Chacon had previously undergone a stress echocardiogram in 2011, which was unsuccessful because he was unable to reach his target heart rate. Thus, it was determined that he was a good candidate for a dobutamine stress echocardiogram. Neither Mr. Chacon's medical history nor his physical exam revealed any contraindications to the stress echocardiogram or the medications, dobutamine or Atropine.

On March 23, 2015, Mr. Chacon presented to the TDC Cardiology Specialty Clinic for his dobutamine stress echocardiogram. At 1023, Mr. Chacon's baseline vitals were obtained and his target heart rate was calculated. His baseline heart rate was 46 beats per minute (bpm) and his blood pressure was 139/90 mmHg, both within the acceptable parameters for a dobutamine stress echocardiogram. Mr. Chacon's target heart rate was calculated at 144 bpm.

The stress echocardiogram was started at 1038 am when the dobutamine infusion was begun at the standard initial starting dose of 5 mcg/kg/min. The test proceeded without incident and at approximately 1040 am, Mr. Chacon's heart rate was measured at 47 bpm and his blood pressure was 156/90 mmHg. At 1041, the dobutamine infusion was increased to 10 mcg/kg/min per protocol. Following the increased [sic] in dobutamine, Mr. Chacon still showed no heart rate response, so 0.25 mg Atropine Sulfate was administered to help increase his heart rate. Mr. Chacon's vital signs were measured again at approximately 1043 am. At that time, his heart rate was 90 and his blood pressure was 203/100 mmHg, both still within the acceptable parameters for a dobutamine stress echocardiogram. Shortly thereafter, Mr. Chacon began complaining of a throbbing headache and numbness. Upon re-checking, his blood pressure had abruptly and unexpectedly increased to 247/136 mmHg. As this measurement is considered a hypertensive endpoint, as described above in #5, the dobutamine was immediately stopped and Mr. Chacon was assessed. At approximately 1046, Mr. Chacon was administered 10 mg Hydralazine, which is the fastest medication to relieve increased blood pressure. Subsequent blood pressure measurements showed an appropriate decrease in Mr. Chacon's blood pressure from 247/136 mmHg to 166/98 mmHg. At approximately 1048 am, Neurology was consulted and a stat Head CT Scan was recommended and ordered, as well as a Stroke Alert. At 1052 am, the Stroke Activation Alert page went out and by 1056, Neurology had arrived at the bedside for evaluation. Mr. Chacon was immediately taken to radiology for his Head CT, which was completed at 1109 am, and then taken to the ICU at approximately 1120 am.

Based on my review of Mr. Chacon's available medical records, there is no indication that his care during the dobutamine stress echocardiogram was substandard. There was no contraindication to the test itself, or to any of the medications utilized during the test. There were also no pre-procedure signs or symptoms predisposing Mr. Chacon to a stroke. Further, once Mr. Chacon's symptoms were recognized, the test was immediately discontinued, the proper specialists were consulted and the appropriate work-up was immediately commenced.

In summary, it is my opinion that Mr. Chacon's care during the dobutamine stress echocardiogram was performed within the standard of care. It is also my opinion that the care Mr. Chacon received immediately upon recognition of his symptoms was consistent with the standard of care. In my opinion, Mr. Chacon underwent [a] routine dobutamine echocardiogram and unfortunately suffered an unforeseeable stroke during the test.

(Dkt. 24, Exhibit B).

As further support, the defendants submitted an affidavit of UTMB employee Stephen P. Busby, M.D., who testifies as follows:

> My name is Stephen P. Busby, M.D. I am over the age of 18 years, fully competent to make and execute this affidavit and have personal knowledge of the facts herein stated.
>
> I earned my Doctor of Medicine degree in 1974 and have been licensed as such in the State of Texas since 1978. I also hold specialty certifications with the American Board of Psychiatry and Neurology in Neurology and in Vascular Neurology and with the American Board of Electroencephalography in electroencephalography. I am presently employed as Clinical Professor in the Department of Neurology for the University of Texas Medical Branch at Galveston (UTMB). I am further a Co-Medical Director of UTMB's Stroke Program. As such, I am familiar with the standard of care for a neurologist responding to a STAT stroke activation for a patient such as Robert Chacon in March 2015.
>
> I am making this affidavit in connection with Civil Action No. 3:16-CV-161, *Robert Chacon v. Director, UTMB-CMC, et al.*; in the United States District Court for the Southern District of Texas, Galveston Division. To prepare this affidavit, I have reviewed the medical records of Robert Chacon, TDCJ #1550395, ("Plaintiff" or "Mr. Chacon") from January 9, 2015 to March 24, 2015. Plaintiff contends that his dobutamine stress echocardiogram, performed on March 24, 2015, was substandard, causing him to suffer a stroke.
>
> Based on my review of the medical records, Mr. Chacon presented on March 23, 2015 for a dobutamine stress echocardiogram, which began at 1038 am. At some point during the test, Mr. Chacon began complaining of a severe headache, numbness, and blurry vision. His blood pressure was taken and noted to be increased at 233/133 mmHg and he was administered one dose of Hydralazine. Subsequent blood pressure measurements showed improvements in Mr. Chacon's blood pressure to 168/103 mmHg.
>
> At approximately 1048 am, Neurology was consulted and a stat Head CT Scan was recommended, as well as a Stroke Alert. Mr. Chacon was immediately taken to radiology for his Head CT. At 1052 am, the Stroke Activation Alert

page went out and by 1056, Neurology had arrived in CT for bedside evaluation. The American Heart Association has recommended a national standard of 5 minutes between the time a Stroke Alert page is activated and the arrival of Neurology. In Mr. Chacon's case, Neurology was present for evaluation in 4 minutes. At that time, Mr. Chacon was alert and oriented to person, place, time and situation with left facial droop, dysarthria and left sided pronator drift. Mr. Chacon's Head CT was completed and interpreted by the Neurology team at 1109 am. The American Heart Association has recommended that a CT scan be initiated within 25 minutes and interpreted within 45 minutes. In Mr. Chacon's case, his Head CT was completed and interpreted in 17 minutes. Mr. Chacon was admitted to ICU at approximately 1120 am and the Stroke order set was activated, which includes Stat lab work, Stat Neurosurgery consult, Stat CT Angio of the head and neck, MRI of the Brain, hourly Neurochecks, Telemetry monitoring and an EKG. At approximately 1200 pm, Neurosurgery evaluated the patient and assumed care. Per the medical records, Mr. Chacon underwent a craniotomy later that same day with no immediate complications.

Based on my review of Mr. Chacon's medical records, there is no indication that his care following the presentation of his stroke-like symptoms was substandard. Once Mr. Chacon's symptoms were recognized, Neurology was immediately consulted and the appropriate stroke work-up was promptly commenced. In summary, it is my opinion that the care Mr. Chacon received immediately upon recognition of his symptoms was consistent with the standard of care.

(Dkt. 24, Exhibit C). The CT scan of plaintiff's head revealed a small intraparenchymal hemorrhage with subarachnoid extension in the right temporal lobe; that is, a cerebral vascular stroke (Dkt. 24, Exhibit D at p. 28).

The medical records submitted by defendants in their motion for summary judgment (Dkt. 24, Exhibits D, E) substantiate the affidavit testimony of Dr. Ahmad and Dr. Busby. The records and probative evidence clearly show that defendant Doe, the physician administering the stress test, promptly responded to the sudden and unexpected change in

plaintiff's physical response to the testing. Specifically, the records show that at 10:43 a.m., plaintiff's pulse and blood pressure were within the acceptable range (Dkt. 24, Exhibit D at p. 548). Shortly thereafter, he began complaining of a throbbing headache and numbness, and his blood pressure was found to have abruptly and unexpectedly exceeded the acceptable range. *Id.* Defendant Doe immediately stopped the dobutamine, and at 10:46 a.m., plaintiff was given hydralazine. *Id.* Within two minutes, plaintiff's blood pressure returned to an acceptable level, and at 10:48 a.m., neurologists were consulted and a head CT scan was ordered. *Id.* At 10:52 a.m, a stroke activation alert page went out and within four minutes a neurology team arrived to evaluate plaintiff. *Id.*

Neither plaintiff nor the records show that defendant Doe ignored plaintiff's physical complaints, refused to stop the test, or actively delayed seeking neurological intervention. Plaintiff presents no probative summary judgment evidence that the physician was deliberately indifferent to his health, safety, or serious medical needs, or in any way refused to treat him, ignored his complaints, intentionally treated him incorrectly, or otherwise clearly evinced a wanton disregard for any serious health, safety, or medical needs. *See Domino*, 239 F.3d at 756. A prison official acts with deliberate indifference "only if he knows that inmates face a substantial risk of serious bodily harm and he disregards that risk by failing to take reasonable measures to abate it." *Farmer* at 847. No such circumstances are demonstrated in this case.

Plaintiff proffers no probative summary judgment evidence controverting his medical records or the testimonies of Dr. Ahmad and Dr. Busby, and no deliberate indifference to his health, safety, or serious medical needs is shown. Moreover, plaintiff's conclusory allegations of negligence and medical malpractice by the defendants are insufficient to state a claim for which relief can be granted under section 1983. Even if plaintiff could establish medical malpractice or negligence, such a showing would be insufficient to establish deliberate indifference or a violation of the Eighth Amendment. *See Gibbs v. Grimmette*, 254 F.3d 545, 549–550 (5th Cir. 2001).

Defendant John Doe, M.D., is entitled to summary judgment dismissal of plaintiff's claims for deliberate indifference to his health, safety, and serious medical needs, and plaintiff's claims against Doe are **DISMISSED WITH PREJUDICE**.

### C. Director of UTMB CMC

Plaintiff alleges in his complaint that the Director of UTMB CMC is liable because he failed to properly train medical staff (Dkt. 1 at p. 3). In his response to the motion for summary judgment, however, plaintiff argues that the defendants were negligent and guilty of medical malpractice (Dkt. 31).

Supervisory officials such as the Director can be held liable under section 1983 only if the plaintiff establishes the supervisor's personal involvement in the acts that caused the constitutional deprivation or a sufficient causal connection between the supervisor's wrongful conduct and the deprivation. *See Gates v. Texas Dep't of Prot. & Reg. Servs.*, 537 F.3d 404,

435 (5th Cir. 2008); *Evett v. Deep East Tex. Narcotics Trafficking Task Force*, 330 F.3d 681, 689 (5th Cir. 2003). A supervisor may be held liable for failure to train if (1) the supervisor failed to train the subordinate official; (2) a causal link exists between the failure to train and the violation of the plaintiff's rights; and (3) the failure to train constitutes deliberate indifference. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

Plaintiff presents no probative summary judgment evidence meeting this burden of proof. More fundamentally, as held above regarding defendant Doe, plaintiff fails to establish a violation of his Eighth Amendment rights. His supervisory claims against the defendant Director therefore fail. *See Porter*, 659 F.3d at 446.

The Director of UTMB CMC is entitled to summary judgment dismissal of plaintiff's claims for failure to train, and plaintiff's claims against the Director are **DISMISSED WITH PREJUDICE**.

## IV. <u>STATE LAW CLAIMS</u>

Plaintiff's complaint and summary judgment response assert claims for negligence and medical malpractice. Medical malpractice and negligence are not cognizable claims for purposes of section 1983, and constitute state law claims.

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental or pendant jurisdiction over a state law claim when it has dismissed all claims over which it has original jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Enochs v. Lampasas County*, 641 F.3d 155, 161 (5th Cir. 2011) (explaining that the rule

15

in the Fifth Circuit "is to dismiss state claims when the federal claims to which they are pendent are dismissed").

Consideration of the relevant factors of judicial economy, convenience, fairness, and comity, particularly in light of the early stage of this case, suggests against this Court's exercise of pendant jurisdiction over these state law claims. The Court's dismissal of plaintiff's federal section 1983 claims support such conclusion.

Accordingly, the Court declines to exercise supplemental or pendant jurisdiction over plaintiff's state law negligence claims.

## V. **CONCLUSION**

Defendants' motion for summary judgment (Dkt. 24) is **GRANTED**, and this lawsuit is **DISMISSED WITH PREJUDICE**. All pending motions are **DENIED AS MOOT**.

The Clerk is directed to provide a copy of this Memorandum Opinion and Order to the parties and to amicus counsel of record for the defendants.

Signed at Galveston, Texas, on ___August 1___, 2018.

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　GEORGE C. HANKS, JR.
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE